**SYRACUSE PLASTICS, INC., Plaintiff,**

v.

**GUY M. TURNER, INC., Defendant.**

**No. 96–CV–1490.**

United States District Court,
N.D. New York.

April 2, 1997.

Byrne, Costello & Pickard, Syracuse, NY (Terry R. Pickard, of counsel), for Plaintiff.

Coulter Fraser, Bolton, Bird & Ventre, Syracuse, NY (J. Mark McCarthy, of counsel), for Defendant.

## MEMORANDUM–DECISION & ORDER

HURD, United States Magistrate Judge.

Plaintiff brought this negligence action against defendant in New York State Supreme Court. The action was removed to this court by defendant on September 13, 1996. The defendant now moves the court to change venue to the District of South Carolina, or in the alternative, to the Middle District of North Carolina. Plaintiff opposes that motion and cross-moves to strike defendant's affirmative defense. Defendant opposes the cross-motion. The court heard oral arguments on January 9, 1997, in Utica, New York. In response to the court's request for analogous case law at oral argument, the plaintiff submitted a letter supplement dated January 10, 1997.

### FACTS

The plaintiff purchased five used Battenfeld presses which are plastic injection molding machines, for use in its manufacturing business in Fayetteville, New York The presses were located in Columbia, South Carolina. As the presses are very large,[1] specialized handling was required for transport of the presses from South Carolina to plaintiff's facility in New York. In August 1995 plaintiff contracted with defendant for shipment of the presses. Under the contract, defendant was to disconnect the internal wiring to the control panels, load the presses, transport them, then unload them at plaintiff's facility. The contract called for payment of $7,965.

On September 26, 1995, Turner Transfer, a trade name used by defendant, disconnected the wiring and loaded the presses on two tractor-trailers. One of the tractor-trailers, which contained one 1204 on press and the two 2604on presses, jackknifed on the ramp leading to the highway and overturned. All three presses aboard were totally destroyed. Plaintiff claims a loss of $104,000 for the

---

1. Two of the presses were 260–ton, and three were 120–ton.

presses and $46,500 for lost profits. Defendant had paid $50,500 to plaintiff at the time the complaint was filed and has shipped the remains of the presses to plaintiff for salvage.

## *DISCUSSION*

### I. *INTRODUCTION*

The defendant bases its motion to change venue on the Carmack Amendment to the Interstate Commerce Act. It argues that venue is proper in the district where the loss occurred under the Carmack Amendment. Plaintiff counter-argues that defendant is exempt from the Carmack Amendment, and that New York can properly obtain long-arm jurisdiction over the defendant Plaintiff further argues that defendant's second affirmative defense, also based upon the Carmack Amendment, should be stricken as defendant is exempt from those provisions.

The court must first determine whether defendant is exempt from the Carmack Amendment. If the Carmack Amendment's provisions apply to defendant, then proper venue is determined by statute and issues of New York long-arm jurisdiction are moot. That determination will also be necessary in determining whether defendant is protected by the limited liability provision of the statute.

### II. *EXEMPTION AS A PRIVATE CARRIER*

█The Interstate Commerce Act ("the Act") requires, inter alia, that motor carriers providing transportation of goods for hire register with the Interstate Commerce Commission ("ICC"), obtain the necessary ICC permits, and comply with other ICC requirements such as rate regulation and maintaining adequate records. *See generally* 49 U.S.C. §§ 13101–16106. "The term 'motor carrier' means a person providing motor vehicle transportation for compensation." § 13102(12). Generally, all motor carriers must comply with the Act. *Keller Indus., Inc. v. United States,* 311 F.Supp. 384, 388 (N.D.Fla.1970). However, a carrier providing transportation that furthers another primary business is exempt from coverage. *Id.* § 13505. The exemption provides:

In general.—Neither the Secretary nor the Board has jurisdiction under this part over the transportation of property by motor vehicle when—

(1) the property is transported by a person engaged in a business other than transportation; and

(2) the transportation is within the scope of, and furthers a primary business (other than transportation) of the person.

§ 13505. The purpose of the exemption was "to assure a healthy regulated monopoly of for-hire carriage while preserving the right of one to transport his own private property by his own transportation facilities." *Agricultural Transp. Ass'n of Texas v. King,* 349 F.2d 873, 878 (5th Cir.1965). The so-called "primary business test" was designed to exclude such private carriers from regulation under the Act, while flushing out for-hire carriers which attempted to avoid regulation by various schemes aimed at appearing like a private carrier, so that the ICC could enforce the Act against the for-hire carriers. *See Red Ball Motor Freight, Inc. v. Shannon,* 377 U.S. 311, 313, 84 S.Ct. 1260, 1261–62, 12 L.Ed.2d 341 (1964).

█ The Act, as a remedial statute, must be liberally construed. *Leitchfield Mfg. Co. v. United States,* 312 F.Supp. 430, 432 (W.D.Ky.), *vacated on other grounds,* 398 U.S. 280, 90 S.Ct. 1729, 26 L.Ed.2d 232 (1970); *Keller Indus., Inc.,* 311 F.Supp. at 388. Exemptions, therefore, will only be held to extend to carriers which are clearly within their ambit. *Leitchfield Mfg. Co.,* 312 F.Supp. at 432; *Keller Indus., Inc.,* 311 F.Supp. at 388 (citing *Georgia Truck Sys., Inc. v. ICC,* 123 F.2d 210, 212 (5th Cir.1941); *Calvine Mills, Inc. v. United States,* 221 F.Supp. 1019, 1022 (D.N.J.1963); *ICC v. Gannoe,* 100 F.Supp. 790, 794 (W.D.Pa. 1951)).

█ In the instant case, defendant registered with the ICC as an interstate motor carrier in 1987 and was issued ICC Motor Carrier's Certificate No. 158451. The vehicle involved in the accident at issue here carried ICC Identification No. 158451. Clearly the defendant considers itself to fall within the coverage of the Act.

In support of its argument, plaintiff submits the affidavit of its Vice President, James Falcone. Mr. Falcone asserts that moving heavy equipment such as the Battenfeld presses at issue here requires the services of a "rigger," due to the need for specialized skills and equipment including cranes and jacks, rather than a "common carrier." Further, the weight of the loads requires a rigger for its specialized equipment and handling. Mr. Falcone represents to the court that the defendant was hired as a rigger, and not as a common carrier. Mr. Falcone points to defendant's letterhead, which identifies the company as a "moving engineer" offering heavy hauling, export packing, rigging, mechanical erection, and crane service. This, Mr. Falcone asserts, shows that defendant is not a "common carrier."

■ It is apparent that plaintiff is relying upon the common definition of "common" to support its argument that defendant is not subject to the Act. Common is defined as "Belonging or shared equally by more than one. Of frequent occurrence. *Without special or distinguishing characteristics.*" Black's Law Dictionary 188 (Abridged 6th ed.1991) (emphasis added). In contrast, as used in relation to interstate commerce and the Act, the term "common carrier" refers to carriers who hold themselves out to the public as transporters of persons or property of anyone who chooses to employ that carrier.[2] *See id.* at 146. Moreover, although defendant may in fact provide services other than transportation to other customers, what is at issue here is the contract between plaintiff and defendant, and what services were provided to plaintiff by the defendant under that contract.

■ It is clear that in this case defendant Guy M. Turner, Inc. is a common carrier which holds itself out to the public as a transporter of property. That much of this transportation may be specialized, requiring heavy handling and cranes for loading and unloading does not change the fact that it is transportation for hire. Defendant asserts that approximately 25 percent of its business

comprising gross annual revenues in excess of $9 million, is transportation. This may give the impression that defendant's primary business, the other 75 percent is a business other than transportation. However, under the act, it is the transaction at issue in relation to the business which must be considered, rather than simply the overall percentage of the carrier's business which the transaction comprises. *See, e.g., ICC v. V.S.C. Wholesale–Warehouse Co.,* 312 F.Supp. 542, 544–47 (D.Idaho 1969)(where carrier transported goods from producer to carrier's warehouse, transportation which amounted to less than $200 per year was not within the scope of and in furtherance of its primary business of warehousing such goods). Transportation is clearly a business of the defendant Moreover, the rigging operations constitute a part of the transportation business. *See PNH Corp. v. Hullquist Corp.,* 843 F.2d 586, 590 (1st Cir.1988)(transportation included " 'services related to that movement including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling and interchange of passengers and property' " (quoting 49 U.S.C. § 10102(26)(B)) (emphasis omitted)).

■ Finally, defendant in no way falls within the definition of a private motor carrier, which § 13505 exempts from coverage under the Act. A private motor carrier is one which transports property when the vehicle travels interstate, the carrier is the owner, lessee or bailee of the property, and "the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." § 13102(13); 13501. Probably the simplest example of a private carrier is a furniture store, which transports sold furniture to the homes of the purchasers. Clearly in that situation the primary business of the store is to sell furniture, and transporting it once it is sold is merely incidental to, and in furtherance of, the primary business. Thus, the furniture store is a private carrier exempt from the requirements of the Act.

2. A common carrier is distinguished from a contract carrier, which contracts with a limited number of parties to transport their property, and from a private carrier, which transports its own property. *See id.*

However, many carriers have attempted to avoid compliance with the Act by schemes such as buy-and-sell arrangements.

A typical buy-and-sell arrangement is one under which the carrier "buys" property at a shipping point, transports it to a delivery point and there "sells" it to the real purchaser, the "profit" to the carrier amounting to the price of the transportation between the two points. Similar evasions through the use of spurious buy-and-sell agreements were found in cases where property was transported in trucks regularly used by noncarrier businesses to make pickups and deliveries.

*Red Ball Motor Freight, Inc.*, 377 U.S. at 313–14, 84 S.Ct. at 1262 (citations omitted). It is the avoidance of regulation by these "pseudo-carriers" which the primary business test, codified as § 13505, attempts to control. *Id.; see also Keller Indus., Inc.*, 311 F.Supp. at 388 (where plaintiffs jointly leased truck, hired driver, and prorated transportation expenses, and the goods of one were transported outbound and goods of the other transported inbound, transportation was not private carriage); *Clearfield Cheese Co. v. United States*, 308 F.Supp. 1072, 1077–78 (W.D.Mo.1969)(where plaintiff delivered its cheese products outbound and backhauled sugar with the sole purpose of profiting from the transportation of sugar, sugar backhaul not exempt as private carriage; only transportation of sugar used in manufacture of cheese products was private carriage); *Shelby Biscuit Co. v. United States*, 297 F.Supp. 1276, 1278–79 (S.D.Tex.1969)(distributor of cookies which delivers load of sugar to cookie supplier when it picks up cookies not exempt from the Act).

There is no question in this case that the presses being transported belonged to plaintiff. Defendant was a bailee in that it had possession of the presses and was under a contract to deliver them. However, the primary purpose of the contract, for defendant, was to profit from the transportation of the presses from South Carolina to New York. That the transportation required specialized loading techniques and equipment does not change the character of the transportation

from for-hire to private. *See PNH Corp.* 843 F.2d at 590.

Accordingly, the court finds that the defendant provided for-hire transportation to plaintiff and therefore is not exempt from regulation under the Act.

## III. *VENUE*

The Act provides that a shipper may bring a civil action to recover damages against a carrier responsible for the loss "in the judicial district in which such loss or damage is alleged to have occurred." § 14706(d)(2). There is no dispute in this case that the loss occurred in Columbia, South Carolina. Venue is proper, therefore, in the District of South Carolina. Accordingly, this court will transfer this action to that District. Due to this disposition, it is unnecessary to address plaintiff's argument regarding New York long arm jurisdiction.

## IV. *AFFIRMATIVE DEFENSE–CARMACK AMENDMENT APPLIES*

Plaintiff cross-moves to strike defendant's second affirmative defense. Plaintiff makes no argument specific to its cross-motion, but merely relies upon its prior arguments regarding the exemption under § 13505. In light of the court's previous finding that defendant is not exempt from the Interstate Commerce Act, plaintiff's cross-motion is denied.

### *CONCLUSION*

Accordingly, it is hereby

ORDERED that

1. Defendant's motion to change venue is GRANTED; and

2. Plaintiff's cross-motion is DENIED.

The Clerk of the Court is directed to transfer this action to the United States District Court for the District of South Carolina.

IT IS SO ORDERED.